IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| LAWRENCEBURG POWER, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:18-cv-232 |
| | ) | |
| LAWRENCEBURG MUNICIPAL | ) | |
| UTILITIES, and | ) | |
| CITY OF LAWRENCEBURG, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

This is a civil action brought by Plaintiff Lawrenceburg Power, LLC ("Lawrenceburg Power") against Defendant Lawrenceburg Municipal Utilities ("LMU"), and Defendant City of Lawrenceburg ("City").  In support of its claims, Lawrenceburg Power states as follows.

**INTRODUCTION AND SUMMARY OF CLAIMS**

1.     Plaintiff Lawrenceburg Power owns a natural gas-fired electric generating facility, the Lawrenceburg Plant (the "Plant"), located in Lawrenceburg, Indiana.  Lawrenceburg Power operates the Plant to sell electric energy, capacity, and other services in the federally-regulated wholesale electric power market managed by PJM Interconnection, LLC ("PJM"), which is the regional transmission organization for the Mid-Atlantic region (including parts of Indiana).  To deliver the electricity it generates to the grid, Lawrenceburg Power is directly interconnected to the high-voltage transmission system owned by Indiana & Michigan Power Company ("I&M"), a subsidiary of the American Electric Power Corporation ("AEP") and an affiliate of the Plant's prior owner, AEP Generating Company ("AEP GenCo").  Although owned by I&M, I&M's transmission lines and related facilities are part of the larger, regional high-voltage interstate transmission system ("HVTS") controlled and operated by PJM.  Both the wholesale market and

the interstate transmission system, including the market managed by PJM, are comprehensively regulated by the Federal Energy Regulatory Commission ("FERC") pursuant to the Federal Power Act ("FPA") (41 Stat. 1063, as amended, 16 U.S.C. § 791a *et seq.*).

2.      The Plant requires electricity to operate certain equipment located on-site, including, for example, the Plant's controls, computers, lighting, heating, air conditioning, and the like.  These electrical requirements are commonly referred to as "station power."  When the Plant is generating electricity, the Plant uses a fraction of the power it generates to directly satisfy the full extent of its station power requirements.  During the infrequent hours when the Plant is not generating electricity, it obtains electricity from its direct interconnection to the FERC-regulated HVTS to meet its station power requirements.

3.      Although Lawrenceburg Power does receive lower voltage retail service from LMU for some of its facilities at the same location as the Plant, those other facilities are not used in the generation of electricity at the Plant, and that other service is not at issue in this case.   The Plant itself does not have any electrical interconnection to the electric distribution system owned and operated by LMU.  As a result, LMU does not and cannot directly supply the Plant itself with any electricity required for station power.

4.      Pursuant to the terms of a certain Mutual Settlement Agreement, Lawrenceburg Power's predecessor in interest and the prior owner of the Plant, AEP GenCo, voluntarily entered into an Agreement for Electric Service on December 23, 2015 with LMU and the City (the "Contract") to resolve a lawsuit among those parties.  The Contract was entered into a few months before AEP GenCo began the process of selling the Plant.  Under the Contract, LMU agreed to furnish the Plant with some form of deemed electric power plant service (although LMU is not electrically interconnected with the Plant), and AEP GenCo agreed to make

2

payments to LMU.   The Contract permits Lawrenceburg Power to unilaterally terminate the agreement on the first day of a calendar year upon one years' notice.  On December 21, 2017, Lawrenceburg Power exercised that right and provided timely written notice to LMU for the termination of the Contract effective January 1, 2019.

5.   Once the termination of the Contract takes effect, Lawrenceburg Power will self-supply all of its station power requirements, including during those limited time periods when the Plant is not generating, under the provisions of the federally-approved Open Access Transmission Tariff that governs PJM's operation of the wholesale market and the regional transmission system ("PJM Tariff").  The PJM Tariff comprehensively regulates the wholesale market and transmission system and is approved in all respects by FERC pursuant to the FPA. Under the federally-approved PJM Tariff, a generator participating in the wholesale market may elect to "self-supply" station power during "negative" intervals (*i.e.* those time periods when the generator is not generating), provided the generator has generated more electricity during a calendar month than it obtains from the HVTS.  In other words, under the PJM Tariff, a generator can "net" its station power requirements against its cumulative generation across a calendar month, provided it has "banked" enough electricity during that month.  This self-supply option is available to any generator that participates in PJM's wholesale market.  Alternatively, a generator may elect, at its option, to have its station power requirements instead served by a third party under a contract, as AEP GenCo appears to have done when it entered into the contract with LMU.  A generator may change its election among these options by giving notice to PJM.

6.   Since providing notice of termination, Lawrenceburg Power continues to pay the amounts owing to LMU under the terms of the Contract and intends to do so during the remaining term of the Contract.

7.     Subsequent to LMU's receipt of a written notice that Lawrenceburg Power exercised its right to terminate the Contract, LMU represented that LMU might in response terminate provision of water and sewer services to the Plant.  Lawrenceburg Power acknowledges that it is a water and sewer customer of LMU, and that these services are a necessary and integral part of the Plant's operations.

8.     LMU advised Lawrenceburg Power that it would undertake a cost of service study as part of an effort by the City and LMU to adopt a new rate ordinance that would purport to impose increased rates on Lawrenceburg Power.  LMU and the City may also take other action in an attempt to subject Lawrenceburg Power to the terms of the Contract or a subsequent rate ordinance passed by the City and implemented by LMU.

9.     If the City and LMU sever water and sewer services, Lawrenceburg Power would effectively have to cease operations.  The Plant would be rendered unworkable for lack of water and sewer service and Lawrenceburg Power would be unable to sell electricity in the PJM wholesale market.  Any such action by the City and LMU would serve to impermissibly frustrate Lawrenceburg Power's rights under the FPA to participate in the wholesale markets operated by PJM, and Lawrenceburg Power's right to self-supply its station power requirements under the FERC-approved PJM Tariff.  Lawrenceburg Power would suffer irreparable harm and the wholesale electricity market administered by PJM would also be harmed because the Plant's generated electricity would not be available to be sold in the market.

10.    Any such actions by the City or LMU in response to Lawrenceburg Power exercising its right to terminate the Contract and exercising a FERC-approved right to self-supply its station power would be preempted by the FPA, FERC's orders issued thereunder, and the FERC-approved PJM Tariff.  Therefore, Lawrenceburg Power seeks a remedy from this

Court through declaratory and other relief to prevent LMU and the City from taking such actions in contravention of federal law — *i.e.* attempting to force Lawrenceburg Power to remain subject to the terms of the Contract, or a new rate ordinance, or forcing Lawrenceburg Power to become an electric customer of LMU, in order to continue receiving water and sewer utility service.

**PARTIES**

11.     Lawrenceburg Power is a limited liability company organized under the laws of the State of Delaware having its principal office address at 500 Alexander Park Drive, Suite 300, Princeton NJ.  Lawrenceburg Power is authorized to do business in Indiana as a foreign limited liability company.  Lawrenceburg Power is wholly owned by Lightstone Generation LLC ("Lightstone Generation"), and Lightstone Generation is a joint venture of The Blackstone Group L.P. and ArcLight Capital Partners, LLC.  Lawrenceburg Power owns and operates the Plant, located in Lawrenceburg, Indiana.  None of the owners of Blackstone Group, L.P. or ArcLight Capital Partners, LLC are citizens of Indiana.

12.     The City is a third class city within the meaning of Ind. Code § 36-4-1-1.  The City is a municipality, organized and existing under the laws of the State of Indiana, located in Dearborn County Indiana.  Pursuant to Ind. Code § 36-4-3-3, the City has the power to define its corporate limits and boundaries.  The City owns and operates LMU, a municipal electric utility pursuant to Ind. Code § 8-1.5-1-1 et seq.  The City and LMU are citizens of Indiana.

13.     LMU provides retail electric, water, and waste water services on an unbundled basis for the Lawrenceburg community within its service territory.

14.     LMU's provision of water and sewer service within its service territory is not subject to the rate jurisdiction of the Indiana Utility Regulatory Commission ("IURC").  Additionally, LMU has withdrawn from the IURC's jurisdiction respecting its electric utility services rates.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 because the claims in this Complaint seek to enforce the Supremacy Clause of the U.S.

Constitution and the FPA, FERC's orders, and the PJM Tariff, and in the alternative diversity

jurisdiction under 28 U.S.C. § 1332(a) because this is a suit between citizens of different states

and the amount in controversy exceeds the statutory requirement.

16.     Venue is proper in the United States District Court for the Southern District of

Indiana pursuant to 28 U.S.C. § 1391(b)(1) because all defendants are located in the district and

all defendants are residents of the State in which this district is located.

## BACKGROUND ON THE FEDERAL REGULATION OF LAWRENCEBURG POWER

17.     Section 201(b) of the FPA gives FERC jurisdiction over the "transmission of

electric energy in interstate commerce" and the "sale of electric energy at wholesale in interstate

commerce," as well as "all facilities for such transmission or sale."  16 U.S.C. § 824(b)(1).

FERC's jurisdiction under the FPA also extends to any rule or practice "affecting" rates charged

for interstate transmission or wholesale electricity.  *Id.* at §§ 824(b) and 824e(a); *see also FERC*

*v. Elec. Power Supply Ass'n.*, 136 S. Ct. 760, 774 (2016) ("*EPSA*").  States, however, retain

jurisdiction over "any other sale of electric energy," including the sale of electricity on a retail

basis to end-use customers, and "facilities used in local distribution" of electricity.  16 U.S.C. §

824(b)(1).  Under FERC's oversight and pursuant to the PJM Tariff approved by FERC, PJM

manages and operates the wholesale electric market and the interstate transmission system in the

Mid-Atlantic region, including in that part of Indiana where Lawrenceburg Power is located.

18.     On February 13, 2017, PJM filed an Interconnection Service Agreement

("Interconnection Agreement") among PJM, Lawrenceburg Power, and I&M pursuant to section

205 of the FPA, Part 35 of FERC's regulations (18 C.F.R. Part 35), and Part VI of the PJM

Tariff.  *See* PJM Interconnection, L.L.C., FERC FPA Electric Tariff, PJM Service Agreements Tariff, PJM Service Agreement No. 4623.  On April 7, 2017, FERC accepted the Interconnection Agreement, effective on the closing date of the transaction in which Lawrenceburg Power acquired the Plant from its prior owner, AEP GenCo.  FERC Letter Order, PJM Interconnection, L.L.C., Docket No. ER17-965-000 (April 7, 2017).  The transaction closed on January 30, 2017, the effective date of the Interconnection Agreement.  See Letter Order, PJM Interconnection, L.L.C., Docket No. ER17-965-001 (June 2, 2017).

19.     The Interconnection Agreement provides the Plant with the right to provide 1,140.30 megawatts ("MW") as a "Generation Capacity Resource" at the "Point of Interconnection" where the Plant's facilities connect to the "Transmission System," which is defined in the Interconnection Agreement as the transmission facilities owned by I&M and under the functional control of PJM.  In other words, the Interconnection Agreement permits the Plant to provide up to 1,140.30 MW of capacity and energy to the PJM-controlled HVTS.  Generally-speaking, capacity is the ability of the Plant to provide electricity up to a certain level of output when called upon by the market, and energy is the actual electricity that is generated and sold in the wholesale market.

20.     The Interconnection Agreement also recognizes Lawrenceburg Power's right to elect how to supply its station power requirements under the options set forth in the PJM Tariff. Interconnection Agreement at Appendix 2, § 8.4 ("[PJM's] rules applicable to Station Power shall control with respect to a Generation Interconnection Customer's consumption of Station Power.")

21.     Lawrenceburg Power is authorized by FERC to sell energy, capacity, and other services at market-based rates under a tariff on file with FERC.  *See* FERC Letter Order, Darby

Power, LLC, *et al.*, Docket No. ER17-256-000, *et al.* (December 20, 2016).  Under that authority and in accordance with the rules set forth in the PJM Tariff, Lawrenceburg Power sells the capacity, energy, and other services that the Plant makes available at the Point of Interconnection in the wholesale electric market regulated by FERC and operated by PJM.  Buyers in the wholesale market in turn purchase capacity and energy to serve end-use customers on a retail basis.

## STATION POWER UNDER THE PJM TARIFF

22.     The PJM Tariff, which among many other things governs generators' participation in the wholesale electric market, defines "Station Power" as "energy used for operating the electric equipment on the site of a generation facility located in the PJM Region or for the heating, lighting, air-conditioning and office equipment needs of buildings on the site of such a generation facility that are used in the operation, maintenance, or repair of the facility."[1] PJM Tariff, Article I – Common Service Provisions, Section 1 – Definitions.

23.     The FERC-approved PJM Tariff permits a "Market Seller" like Lawrenceburg Power to "self-supply Station Power for its generation facility during any month (1) when the net output of such facility is positive, or (2) when the net output of such facility is negative and the Market Seller during the same month has available at other of its generation facilities positive net output in an amount at least sufficient to offset fully such negative net output."  PJM Tariff, Attachment K, Section 1.7.10(d)(i).  "Net output" is defined as "the facility's gross energy output, less the Station Power requirements of such facility, during that month."  *Id.*

---

[1] The capitalized term "Station Power" is a defined term in the PJM Tariff.  The capitalized term is used in this Complaint only in connection with excerpts from the PJM Tariff or other documents in which the defined term appears.

24.     For generators that elect to self-supply station power either for a single plant (the first option above) or among two or more commonly-owned plants (the second option above), the determination of whether the generator's "net output" is positive or negative is made by PJM. PJM Tariff, Attachment K, Section 1.7.10(d)(i).  If the generator's "net output" is positive, *i.e.,* it generated more electricity during the month than it required for station power, then, under the PJM Tariff, it has self-supplied all of its station power requirements with its net output, including any electricity delivered to the facility from the HVTS.  Put differently, the generator is determined to have "banked" enough electricity in the wholesale market to take back later. Thus, because station power delivered from the HVTS is netted against generation output, in no sense is the generator obtaining "free" electricity by self-supplying.  As an accounting matter, the value of the electricity delivered from the HVTS is deducted by PJM from the value of the electricity the generator delivers to the PJM market over the HVTS.  *Id.* ("For each hour when a Market Seller has positive net output and delivers energy into the Transmission System, it will be paid the [locational marginal price ("LMP")] at its bus for that hour for all of the energy delivered.  Conversely, for each hour when a Market Seller has negative net output and has received Station Power from the Transmission System, it will pay the LMP at its bus for that hour for all of the energy consumed.").

25.     If the generator's "net output" for a calendar month is negative, *i.e.*, it has generated less than it required for station power, then the plant did not have sufficient generation to self-supply its station power requirements and the amount by which the plant's station power requirements exceeded its generation is a third-party sale of electricity to the facility by the local utility.  PJM Manual 28 at 101-02.  In that circumstance, "[a] PJM billing adjustment will shift the financial responsibility for the wholesale value of the third party sale of station power

consumption from the generation owner to the appropriate [local utility]," and the local utility bills the generator for that electricity.  *Id.*

26.     In addition to these two options – self-supply of station power by a single plant or self-supply of station power among two or more commonly-owned plants – the PJM accounting manual recognizes a third option for generators, which consists of entering into a bilateral agreement with a local utility for its station power requirements.  PJM Interconnection, L.L.C., Manual 28: Operating Agreement Accounting, Section 13: Station Power Accounting, at 101 (2018) ("PJM Manual 28").  This arrangement is similar to what occurs when a generator that elects to self-supply has negative net output during a particular month and the local utility bills the generator for the net negative output during that month.  Under the third option, the difference is that for every month, regardless of whether the plant's output to the HTVS for the month is positive or negative, "compensation for station power consumption is handled bilaterally between the [local utilities] and generation owners and PJM billing adjustments for station power are not applicable."  *Id.*

## FOLLOWING TERMINATION OF THE CONTRACT, LAWRENCEBURG POWER WILL SELF-SUPPLY STATION POWER UNDER THE PJM TARIFF AND WILL NO LONGER MAKE PAYMENTS TO LMU UNDER THE CONTRACT

27.     Under the Contract, which qualifies as a bilateral agreement under the third option for supplying station power, LMU charges Lawrenceburg Power every month a demand charge for electric service (typically the charge to have electric power available when required), as well as a usage charge for any electricity that Lawrenceburg Power requires (typically the charge for electricity actually delivered).  However, LMU does not own or operate any physical infrastructure that connects to the Plant, and the Plant is not connected in any way to LMU's lower-voltage distribution system.  LMU does not meter the electric lines into the Plant that measure electricity consumed by the Plant.  Instead, upon information and belief, any electrical

usage by the Plant from the HTVS gets assigned by I&M, the owner of the HVTS to which the

Plant is connected, to Indiana Municipal Power Agency ("IMPA"), a wholesale electric seller

that exclusively provides wholesale power to LMU and other municipal utilities that constitute

IMPA's membership, and IMPA in turn then assigns it to LMU.

28.     Because Lawrenceburg Power is not interconnected to LMU, and LMU has not

and is not required to invest in, build, or maintain any facilities to deliver electricity to the Plant,

the Contract is not an agreement for actual electric service, but instead is an agreement for

Lawrenceburg Power to make payments to LMU.  As discussed in more detail below, the

Contract resulted from the settlement of a lawsuit between LMU and AEP GenCo, the prior

owner.  The rate ordinance adopted to support the rate in the Contract, memorialized as the

"Retail Power Plant Service" rate schedule attached to the Contract, was based upon a cost and

revenue study that shows a 90% profit margin for LMU for the rate charged to Lawrenceburg

Power (the profit margin would have been 100% but for the allocation of invoicing and payment

processing costs).  Thus, the Contract represents substantial payments by Lawrence Power (and

its predecessor) to LMU that increase LMU's revenue and thus subsidize LMU's other

customers.

29.     The Contract permits Lawrenceburg Power to unilaterally terminate the

agreement, with one years' notice, with termination effective the first day of a calendar year, and

does not require any successor agreement.  Thus, the Contract recognizes that Lawrenceburg

Power is not mandated by any law to take any electric service from LMU other than as a matter

of voluntary and mutual agreement.  On December 21, 2017, Lawrenceburg Power exercised its

termination right and provided timely written notice to LMU for the termination of the Contract

effective December 31, 2018.

30.     Following termination of the Contract, Lawrenceburg Power will self-supply its station power, using the single-facility netting option provided by the PJM Tariff.  Prior to the January 1, 2019 termination date of the Contract, Lawrenceburg Power will inform PJM of its decision to self-supply station power under the PJM OATT effective January 1, 2019. Lawrenceburg Power will also inform its metering agent, of that election, so that any electricity delivered from the grid will be reported to PJM and accounted for in the netting.

31.     Upon the effective date of the expiration of the Contract, regardless of whether Lawrenceburg Power is presently a customer of LMU (and Lawrenceburg Power contends it is not because it does not take any electricity from LMU), Lawrenceburg Power will at that time unquestionably not be a customer of LMU.  Lawrenceburg Power will self-supply its station service under the PJM Tariff, and as explained by FERC:

> [b]ecause a self-supplying generator is not using another's generating facilities, it is not causing another to incur costs associated with the usage of the other's generating resources that would warrant a form of consideration.  In other words, there is no sale (for end use or otherwise) between two different parties, but only one party using its own generating resources for the purposes of self-supply and accounting for such usage through the practice of netting.

*PJM Interconnection, LLC,* 94 FERC ¶ 61,251, at p. 61,890, *reh'g denied,* 94 FERC ¶ 61,251 (2001).  Simply put, Lawrenceburg Power will not be a customer of LMU.

### ANY STATE OR LOCAL LAW OR ACTION ATTEMPTING TO REGULATE STATION POWER IN PJM IS PREEMPTED

32.     The FPA empowers the FERC to oversee "the transmission of electric energy in interstate commerce," as well as "the sale of electric energy at wholesale in interstate commerce."  16 U.S.C. §824(b)(1).  Additionally, the Commerce Clause of the U.S. Constitution prohibits state and local regulators from regulating many interstate transactions, including

interstate wholesale markets.  *Public Util. Comm'n of R. I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89–90 (1927).

33.     The FPA reserves to the States authority to regulate third-party sales of electricity to end-use consumers.  FERC however, has jurisdiction to promulgate and approve the rules applicable to the wholesale marketplace, including use of the HVTS and the station power set forth in the PJM Tariff.  *EPSA*, 136 S. Ct. at 773 ("The FPA delegates responsibility to FERC to regulate the interstate wholesale market for electricity—both wholesale rates and the panoply of rules and practices affecting them."); *City of Cleveland, Ohio v. FERC*, 773 F.2d 1368, 1276 (D.C. Cir. 1985).  Indeed, the station power rules set forth in the FERC-approved PJM Tariff only address transactions that take place entirely in the confines of the wholesale electricity market.  *Id*. at 776 ("In sum, whatever the effects at the retail level, every aspect of the regulatory plan happens exclusively on the wholesale market and governs exclusively that market's rules.").

34.     Moreover, the PJM Tariff itself is "the equivalent of a federal regulation" and thus precludes any state or local laws or actions that are inconsistent or conflict with its terms. *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th Cir. 2004), *cert. denied*, 544 U.S. 974 (2005); *see also Yorty v. PJM Interconnection, L.L.C.*, 79 A.3d 655, 664 (Pa. Super. Ct. 2013).  Further, under the filed rate doctrine, which is "closely related" to federal preemption, state or local law "may not be used to invalidate a filed rate nor assume a rate would be charged other than the rate adopted by the federal agency in question."  *California ex rel. Lockyer*, 375 F.3d at 852-53 (internal quotation marks and citations omitted).  This doctrine is "not limited to rates per se," but also extends to "the terms of a filed tariff."  *Id.* at 853 (internal quotation marks and citations omitted).  Here, the PJM Tariff provisions concerning station power have been approved by FERC under the FPA in final and non-appealable orders.  *PJM Interconnection,*

*LLC,* 94 FERC ¶ 61,251, *reh'g denied,* 94 FERC ¶ 61,251 (2001).  Thus, they are "the law" on how a generator in PJM can supply its station power.  *California ex rel. Lockyer*, 375 F.3d at 853 (collecting cases).

35.     The FERC-approved Interconnection Agreement among PJM, Lawrenceburg Power, and I&M also reinforces and underscores this conclusion.  Section 8.4 provides that "[PJM's] rules applicable to Station Power shall control with respect to [Lawrenceburg Power's] consumption of Station Power."  PJM Interconnection, L.L.C., FERC FPA Electric Tariff, PJM Service Agreements Tariff, PJM Service Agreement No. 4623, Appendix 2 (Standard Terms and Conditions for Interconnection), Section 8.4 (emphasis added).  While LMU and the City are not a party to the Interconnection Agreement, the filed rate doctrine nevertheless prohibits them from taking any action inconsistent with its terms.  *AEP Tex. N., Co. v. Tex. Indus. Energy Consumers*, 473 F.3d 581, 584 (5th Cir. 2006) ("The states are bound to implement a FERC-approved agreement.").

## LMU Is Preempted From Taking Action Aimed at Forcing Lawrenceburg Power to Keep the Contract in Place

### Actions and Threats Regarding A New Electric Rate Ordinance

36.     LMU and the City may attempt to coerce Lawrenceburg Power to not proceed with the termination of the Contract and self-suppling station power under the PJM Tariff.  LMU has undertaken a cost of service study as part of an effort to adopt a new rate ordinance that would purport to impose unjust and unreasonable rates on Lawrenceburg Power.  LMU and the City may also attempt other municipal action in an attempt to force Lawrenceburg Power to remain subject to the terms of the Contract or any subsequent rate ordinance passed by the City and implemented by LMU.

37.     The adoption of a local ordinance or other action undertaken by LMU or the City that would require Lawrenceburg Power to be a customer of LMU or to pay LMU for electric service would be invalid as a matter of both federal preemption and the filed rate doctrine.  Any such ordinance or action would seek to abrogate or limit Lawrenceburg Power's right to self-supply station power.  Such action is contrary to FERC's exclusive jurisdiction over matters related to the wholesale electricity market and interstate transmission, would interfere with FERC's comprehensive regulation in these areas, and directly conflict with the PJM Tariff and the Interconnection Agreement.

38.     There is no provision of state law that would support prohibiting Lawrenceburg Power from self-supplying electricity.  The Service Area Assignments Act ("SAA") (Acts 1980, P.L. 69; IC § 8-1-2.3-1 *et seq*.), which confers upon LMU the sole right to furnish retail electric service to each present and future consumer within the boundaries of its assigned service area, recognizes that an entity may also self-supply electricity.  Specifically, the express and fundamental policy of the statutory scheme is to "eliminate or avoid unnecessary duplication of electric utility facilities, to prevent the waste of material and resources, and to promote economical, efficient, and adequate electric service to the public."  *See* Ind. Code §§ 8-1-2.3-4 and § 8-1-2.3-1; *Knox County Rural Elec. Membership Corp. v. PSI Energy*, 663 N.E.2d 182 (Ind. Ct. App. 1996).  Self-supply of electricity furthers each of these policies.  In contrast, upon the termination of the Contract, LMU would, at a minimum, need Lawrenceburg Power's authorization and need to install electrical interconnection facilities, including meters, before it could provide any electricity to Lawrenceburg Power.  However, duplication of the existing interconnection facilities among PJM, Lawrenceburg Power, and I&M to create an interconnection with LMU is wholly inconsistent with the SAA.

39.     To the extent that LMU may contend that the SAA restricts Lawrenceburg Power's right to self-supply under the PJM Tariff, that interpretation also would be invalid as a matter of both federal preemption and the filed rate doctrine.  Enforcing such an interpretation of the SAA would abrogate Lawrenceburg Power's right to self-supply station power, which would intrude upon FERC's exclusive jurisdiction over matters related to the wholesale electricity market and interstate transmission and would directly conflict with the PJM Tariff and the Interconnection Agreement.

**Water and Sewer Service**

40.     On or about December 7, 2017, LMU attempted to dissuade Lawrenceburg Power from exercising its right to terminate the Contract and its FERC-approved right to self-supply station power under the PJM Tariff by suggesting it would sever water and sewer services to Lawrenceburg Power in response to Lawrenceburg Power terminating the Contract.

41.     Any action by LMU and the City to limit or discontinue water service to Lawrenceburg Power would restrict or interfere with Lawrenceburg Power's participation in the wholesale electricity market and use of the interstate transmission system.  Such action would prevent Lawrenceburg Power from selling and transmitting electricity and thus would be an attempt to dictate which generation resources may participate in wholesale electricity markets and use the interstate transmission system.  As a result, such action would directly affect wholesale rates and the interstate transmission system and impermissibly interfere with the FERC's statutory obligation to ensure that wholesale electricity markets produce just and reasonable rates.  Such action is not permitted under federal law even if arguably taken in the pursuit of legitimate state aims.  *See, e.g., Hughes v. Talen Energy Marketing LLC*, 136 S. Ct.

1288, 1298 ("States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates.").

42.     Because LMU is not subject to the jurisdiction of the IURC respecting its provision of water and sewer services, a remedy for such action would need to be sought in court.  Such a case could to take months for resolution.  Without adequate water and sewer service, the Plant would not be able to operate due to operational and safety requirements mandated by state and federal regulators.  Any such action by LMU would force the shutdown of the Plant, and thus Lawrenceburg Power would be prevented from participating in the PJM wholesale markets regulated by FERC during the pendency of the civil matter or have to seek and obtain a preliminary injunction.  Such an action by LMU would violate the FPA and would therefore be preempted under federal law.

### PRIOR ORDINANCES AND LITIGATION REGARDING THE CONTRACT

43.     LMU and the City have previously litigated challenges to their perceived rights over the Plant.  For example, on February 19, 2015, Lawrenceburg Power's predecessor in interest, AEP GenCo, filed a lawsuit against LMU, in this District Court (*AEP Generating Co. v. Lawrenceburg Municipal Utilities*, Case No. 1:15-CV-00275-JMS-DKL) asserting a contract action against LMU for improperly assessing charges against AEP GenCo in violation of the parties' prior contract.  Immediately thereafter, on or about March 2, 2015, in response to AEP GenCo filing the federal lawsuit, the City purported to pass an ordinance to establish new rates and charges for electric service to AEP GenCo (the "Ordinance") by LMU.

44.     Following the City's purported adoption of the Ordinance, AEP GenCo filed another lawsuit on March 30, 2015 seeking a declaratory judgment that the City could not enforce the Ordinance and charge AEP GenCo the new rates.  *See*, *AEP Generating Company v. City of Lawrenceburg*, Cause No. 15C01-1503-PL-0022  AEP GenCo was required to file that

lawsuit in state court within five (5) days of the date the City purported to pass the Ordinance or face an argument that its challenge to the Ordinance was untimely.  *See* Ind. Code § 8-1.5-3-8.2 (requiring a complaint challenging a rate ordinance adopted by a withdrawn municipality to be filed within five (5) days).  The impetus for this second lawsuit was the City's actions.

45.     Given the history of prior disputes and actions by the City and LMU regarding the Plant and the history of the City rapidly drafting Ordinances in response to judicial proceeding involving this Plant, there is a risk that LMU will take action against Lawrenceburg Power, including termination of water and sewer services.  Also, there is a risk that the City may adopt an ordinance that would serve to frustrate Lawrenceburg Power's right to terminate Contract or attempt to force it to accede to the demand to enter into a new agreement, whether through imposition of improper pricing for services, cutting off other, essential services, or other action. LMU has undertaken a new cost and revenue study and has indicated it may use that study to support imposing higher rates on Lawrenceburg Power under a new rate ordinance.

46.     On information and belief, there are a number of reasons that any such ordinance could not be enforced, each of which on its own would provide an independent reason to enter judgment in favor of Lawrenceburg Power and declare the City's Ordinance unenforceable.

<u>**CLAIMS FOR RELIEF**</u>

47.     Lawrenceburg Power incorporates all previous paragraphs of this Complaint in each of its Counts.

<u>**COUNT I – FEDERAL PREEMPTION AND THE FILED RATE DOCTRINE**</u>

48.     The FPA grants authority to the FERC to occupy and regulate the field of wholesale energy in the interstate market.  FERC's goal is to maintain the integrity of the interstate market by efficiently allocating supply and demand.  The carefully calibrated scheme

of FERC preserving federal regulation of the wholesale electricity market and interstate transmission, while allowing state control over retail electric service provided to consumers.

49.     The preemption doctrine is rooted in the Supremacy Clause, which provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2.

50.     Federal preemption of state law can occur in various ways.  First, Congress may preempt state law by the explicit language of a federal statute.  *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 203, 103 S.Ct. 1713, 1721, 75 L.Ed.2d 752 (1983).  Second, Congress may "occupy a field" by enacting legislation so comprehensive that "'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  *Id.* at 204, 103 S.Ct. at 1722 (*quoting Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982)).  Finally, "[e]ven where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law."  *Id.*  "Conflict" preemption can occur where compliance with both federal and state law is impossible, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id*. (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

51.     Under the related filed rate doctrine, no state or local actor is permitted to take any action to change, undermine, or interfere with a filed rate approved by a federal agency.  The PJM Tariff, which sets forth the rules regarding station power, is covered and protected by the filed rate doctrine.  *See California ex rel. Lockyer*, 375 F.3d at 339, 852-53.

52.     If the City and LMU sever water and sewer services to Lawrenceburg Power, such action would be contrary to the PJM Tariff, which affords Lawrenceburg Power the right to self-supply station power.  Further, Lawrenceburg Power will be prevented from selling electricity in the wholesale markets operated by PJM and transmitting electricity over the PJM-controlled HVTS.  Such actions by the City and LMU would be preempted by the FPA, FERC's orders issued thereunder, and the FERC-approved PJM Tariff, and would violate the filed rate doctrine.

53.     Lawrenceburg Power also brings this action to proactively prevent the City or LMU from passing any ordinance or undertaking any related action in response to Lawrenceburg Power exercising its right to terminate the Contract in an attempt to require Lawrenceburg Power to be an electric customer in contravention of the FPA, FERC's orders issued thereunder, and the FERC-approved PJM Tariff, and in violation of the filed rate doctrine.

54.     Plaintiff will suffer irreparable injury, loss and damage for which it has no timely, adequate remedy at law for LMU's threated termination of its water and sewer service and other potential legislative action by the City that would be preempted by the FPA and barred by the filed rate doctrine.

55.     Plaintiff is entitled to declaratory relief and a permanent injunction.

**WHEREFORE**, Plaintiff respectfully requests the Court to enter a judgment that:

(a)     Includes a declaratory judgment that upon termination of the Contract, Lawrenceburg Power will no longer be, and is not required to be, an electric customer of LMU;

(b)     enjoining Defendant on a preliminary and permanent basis, from enforcing or threatening to enforce any termination of water or sewer services against Plaintiff related to electric usage;

(c)     enjoining Defendant on a preliminary and permanent basis, from enforcing or threatening to enforce any Ordinance that may purport to require Lawrenceburg Power to continue to be an electric customer of LMU beginning January 1, 2019 or any Ordinance the practicable effect of which would be the prevention of LMU from participation in the PJM wholesale markets or its receipt of Station Service from I&M or other third party electric supplier as designated by Lawrenceburg Power; and

(d)     granting such other and further relief as the Court may deem equitable and just.

Respectfully submitted,

/S/ Bart A. Karwath
Bart A. Karwath ( IN Atty. No. 16088-49)

BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone:  (317) 231-7252
Facsimile:  (317) 231-7433
Bart.Karwath@btlaw.com

*Attorneys for Plaintiff Lawrenceburg Power, LLC*

DMS 13604362.1

21